## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

TEXAS STATE CONFERENCE OF NAACP BRANCHES,

    Plaintiff,

    v.

GREG ABBOTT, in his official capacity as Governor of Texas; RUTH HUGHS, in her official capacity as Texas Secretary of State;

    Defendants.

Case No. 1:20CV1024

Related to:

*Texas League of Untied Latin American Citizens v. Abbott*, No. 1:20-cv-1006

*Straty v. Abbott*, No. 1:20-cv-1015

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    This Complaint challenges the constitutionality of Governor Greg Abbott's October 1, 2020 proclamation ("October 1 Order") that prohibits Texas counties from providing voters with more than one location to return their marked mail-in ballots for the November 2020 election.

2.    The October 1 Order is a thinly viewed attempt to suppress the vote under the guise of "enhancing ballot security" and means that thousands of Texans who must vote by mail to avoid the risk of COVID-19 infection will be prevented from dropping off their mail-in ballots at easily accessible and secure county drop-off locations.  In the State's largest counties, including Harris and Travis, the October 1 Order alters the status quo shortly even though voters had already started returning absentee ballots and a little over a month before the November 3 election.  Harris County had already designated eleven drop-off locations as well as NRG Stadium and Travis County had designated four such locations.  For many voters who will vote

by mail, the nearest drop-off location will now be dozens of miles away, forcing those voters to travel long distances to deliver their ballots to their county's election administration office or drop-off location or to put their ballots in the care of the overburdened United States Postal Service ("USPS"), which has explicitly informed Defendants that election mail will be delayed in Texas.  This effort to restrict Texas voters' access to voting during the pandemic imposes a significant, unjustifiable burden on voting and must be immediately enjoined.

3.      For Texas' absentee voters -- including those who had already requested or received their absentee ballot with the expectation that they would be able to use one of many drop-off locations offered by their county -- the effect of the October 1 Order is to unreasonably burden their ability to vote.  They will have to travel greater distances, face longer waits, and risk exposure to COVID-19, in order to use the single ballot return location in their county.  Indeed, there are already news reports of long lines at Harris County's sole absentee ballot drop-off location, NRG Stadium.  And, if they are unwilling or unable to face these new burdens, they will have to rely on a hobbled postal mail system and its potential delay, which will not be a realistic option close to Election Day.

4.      In the midst of an election that is already underway, changing the status quo and forcing such new burdens on voters who relied on a different set of election rules to make their voting plan, is unreasonable, unfair, and unconstitutional.  And, as Governor Abbott and other state officials have stated on the record in other voting cases, such last-minute changes to voting procedures engender voter confusion and undermines the public's confidence in the election itself.

5.      As of October 6, Texas has seen nearly 770,000 confirmed cases and more than 16,000 people have died. Texans age 65 and older constitute approximately 70% of those

fatalities, despite that age group making up less than 13% of the state's overall population. These figures are not surprising: before the novel coronavirus even touched U.S. soil, epidemiologists warned that individuals above the age of 65 and individuals with certain underlying heath conditions are particularly vulnerable to COVID-19's most severe consequences.

6.     Crucially, the October 1 Order disproportionately disadvantages African-American voters in Texas, because African-American voters are more likely to live in poverty and less likely to own a vehicle than other populations.  The existence of only a single ballot drop-off location in each Texas county necessarily means that a significant proportion of each county's African-American voters who do not live near the single permitted location will face greater burdens to exercising their voting rights.  The October 1 Order thus impedes the Texas NAACP's mission of securing political equality for African-American voters in Texas.

7.     The Texans whose age puts them at the highest risk of severe complications from the virus are, fortunately, eligible to cast their ballots by mail. Still, the right to vote extends beyond just the right to cast a ballot.  Rather, the right to vote includes "the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. ***The right to vote includes the right to have the ballot counted***."  *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted) (emphasis added).  Particularly in light of the pandemic and its myriad impacts on daily life, the October 1 Order will unduly burden and, in some cases, entirely prevent the most vulnerable Texans from having their votes counted in November.

8.     The October 1 Order is an abrupt about-face by Governor Abbott, who during the summer recognized that skyrocketing rates of COVID-19 infection in Texas, and resulting calls for expanded voting by mail, required an expansion of voting opportunities.  As a result, on July 27, 2020, Governor Abbott issued a proclamation extending early voting in Texas by an

additional week to October 13 and suspending the Texas Election Code provision that permitted voters to return their mail-in ballots in person only on election day ("July Proclamation"). The July Proclamation permits eligible voters to return their marked ballots to a county drop-off location on election day or during the early voting period. With the July Proclamation, Texas joined many other states in offering voters the opportunity to return their mail-in ballots at secure, tamper-proof ballot drop-off sites that are available in the weeks leading up to the election so that voters may quickly and efficiently submit their completed ballots as their schedules allow and with increased safety due to the reduction in congestion/traffic due to the increased number of ballot drop off locations. The July Proclamation was not only consistent with the available science about the risks of COVID but also with Governor Abbott's then-measured approach to election administration. On June 29, 2020, Governor Abbott argued in federal court that "precipitous changes to the [election] rules can cause 'confusion' and even undermine public confidence in the outcome of the election itself."

9.      The July Proclamation made clear that expanded early voting in person and a bigger window for voters to hand-deliver mail-in ballots was the state's answer to its citizens' concerns about participating in the November election during the pandemic. Counties therefore began preparing for a longer in-person early voting period and, at the same time, considered establishing additional mail-in ballot drop-off locations to ensure that voters casting their ballots by mail have ready access to drop-off locations.

10.     These preparations were grounded in state law, as confirmed by the Texas Attorney General's office, which on September 30, 2020 represented to the Texas Supreme Court that the July Proclamation permitted multiple ballot drop-off locations in each county.

Earlier this election cycle, the Texas Supreme Court had expanded the class of voters eligible to vote by absentee ballot.

11.     The availability of ballot drop-off locations has become absolutely critical in the pandemic.  While other means of voting may allow voters to cast their ballots outside of regular business hours, or in a manner that minimizes in-person interactions, or at a location that guarantees their ballot is submitted in time to be counted, drop-off locations provide the only means of voting that guarantee voters all of these things, ensuring that even those voters who are most vulnerable to the worst complications of COVID-19 and rightfully concerned about the mounting delays in mail service by the USPS have safe and available means of returning their ballots to elections officials in time to be counted.

12.     The availability of accessible drop-off locations is especially crucial in counties with large populations.  The U.S. Election Assistance Commission ("EAC"), an independent federal agency, currently recommends at least one drop-off location for every 15,000 to 20,000 registered voters.  In Harris County alone, there are over 2 million registered voters, and the Harris County Clerk has stated that he expects that seven to eight times more mail ballots will be requested for this November's election than in a typical general election.  But Governor Abbott has ignored this EAC guidance, as well as his constituents' grave concerns, and needlessly chosen to prevent county officials from taking reasonable steps that are plainly required to protect vulnerable Texans' ability to vote in this election.

13.     Plaintiffs therefore seek emergency relief from this Court to enjoin the unlawful October 1 Order and preserve the status quo for the November election.

**PARTIES**

14.     Plaintiff THE TEXAS STATE CONFERENCE OF NAACP BRANCHES ("Texas NAACP") is a subsidiary organization of the National Association for the Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-partisan organization founded in 1909.  The first Texas branches of the NAACP were formed in 1915, and the Texas State Conference was formally organized in 1937.  The Texas NAACP is the oldest and one of the largest and most significant organizations promoting and protecting the civil rights of persons of color in Texas.  The Texas NAACP's mission is to secure the political, educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons.  To achieve its mission, the Texas NAACP engages in voter education and registration and other civic engagement activities.  It is headquartered in Austin and has over sixty branches across the State, as well as members in almost every Texas county. A large portion of the organization's more than 10,000 members are Texas residents who are registered to vote in Texas.  The Texas NAACP's membership consists largely of African Americans, and it considers its constituents and supporters to be people of color and/or members of other underrepresented and vulnerable populations, such as those with disabilities.  The Texas NAACP's members and constituents are more likely than other populations to live in poverty, work in essential jobs that require more frequent exposure to the public, and suffer from underlying conditions that put them at risk of becoming more seriously ill from COVID-19.

15.     The October 1 Order frustrates the Texas NAACP's mission and get out the vote efforts.  The October 1 Order causes the Texas NAACP to divert resources from these programs and initiatives, in order to assist its members and constituents specifically, and Texas voters generally, with overcoming the burdens imposed by the Order.  The Texas NAACP has to retool its get out the vote efforts midstream to help voters who want to vote by absentee ballot.  In the

context of COVID-19, these burdens are even more severe, and the resources that the Texas NAACP will need to divert from its other programs in order to combat these burdens are even more substantial.  Many of the Texas NAACP's members and constituents have planned to vote absentee this year to protect their physical health and the health of others in their communities, given the threat of COVID-19.  The Texas NAACP has been engaged in education of its members and constituents to ensure that they are able to comply with each of the requirements for voting absentee.  Because of widespread reports of delays in mail processed by the United States Postal Service, and because the Texas NAACP State Conference Secretary has noticed timeliness issues with the mail in Texas and taken remedial actions in response, many of the Texas NAACP's members and constituents plan to drop off their ballots at one of the drop-off locations provided by, or planned to be provided by, Texas elections officials, to ensure that their ballots are timely received and counted.  In light of the October 1 Order, however, the Texas NAACP has been forced to rapidly and unexpectedly divert resources away from its ongoing voter education and registration activities and redeploy them towards educating voters about the impact of the Order.

16.    Defendant GOVERNOR GREG ABBOTT is the Governor of Texas and, pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas.  He issued the October 1 Order and is being sued in his official capacity.

17.    Defendant RUTH HUGHS is the Texas Secretary of State and, pursuant to Texas Election Code § 31.001, is the chief election officer of the State of Texas.  She is sued in her official capacity.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act, and pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

19.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

20.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### COVID-19's Disparate Racial Impact

21.    The COVID-19 pandemic has ravaged the United States for nearly seven months. On March 13, 2020, President Donald J. Trump declared a state of emergency for the nation, and Defendant Governor Abbott declared a state of disaster for the State of Texas.  Both declarations remain in place and the pandemic shows no signs of abating this year.

22.    To date, more than 7.4 million Americans have tested positive for the disease, and nearly 210,000 have died.  Texas has been among the states impacted most severely by the virus. More than one in ten of the nation's cases are in Texas—nearly 770,000 in total—and over 16,000 Texans have died.  Nearly 2,000 Harris County residents have lost their lives in the pandemic, as have over 1,000 residents of Dallas County.  Thousands of new positive tests are reported across Texas each day.  Nearly 70 percent of the Texans who have died from COVID-19 were 65 or older despite that age group making up less than 13 percent of the state's overall population.

23.     The impact of the virus has been disproportionately felt by communities of color. According to the U.S. Centers for Disease Control and Prevention ("CDC"), African Americans are 2.6 times as likely as whites to test positive for COVID-19, 4.7 times as likely to be hospitalized, and 2.1 times more likely to die.  CDC data indicates that Hispanic Americans are roughly as likely as whites to die of COVID-19, but 2.8 times as likely to test positive and 4.6 times as likely to be hospitalized.  Other analyses that adjust by age differences among racial groups have found that the mortality rate of Hispanic Americans is 3.3 times as high as for white Americans.

24.     These trends are reflected in Texas, where African Americans account for 12 percent of the state's population but 19 percent of COVID-19 cases.  And while Hispanics make up only 40 percent of the state's population, they account for 56 percent of its COVID-19 deaths, and small, predominantly Hispanic counties have accounted for an outsize proportion of the state's deaths.  White and Asian Texans have died at lower rates relative to their share of the state's population.

**The Pandemic's Impact on Voting**

25.     The pandemic's impact on voting in the 2020 election cycle has been immense. Dozens of states have modified their absentee voting protocols as interest in voting by mail has surged, and mail voting rates skyrocketed in primary elections earlier this year in comparison to primaries in past years.

26.     The CDC has specifically urged election officials across the nation to provide voters with alternatives to in-person voting to minimize exposure between poll workers and voters and reduce crowd sizes at polling locations.  For older voters most susceptible to severe

illness from COVID-19, minimizing the need to vote in person on election day is essential to protecting their health.

27.     In Texas, election officials are expecting record interest in voting by mail for the November general election.  Travis County Clerk Dana DeBeauvoir predicts that some 100,000 voters in Travis County will cast their ballots by mail.  As of October 1, Travis County had received 71,000 mail-in ballot applications, a substantial increase over the average of 27,000 applications in past presidential elections.

28.     In Harris County, mail voting in the July 2020 runoff election approached general election levels, and Harris County Clerk Chris Hollins expects seven to eight times more mail ballots will be requested and cast in the November election.  In preparation for this exponential growth in mail ballots, Harris County officials are purchasing additional mail-sorting equipment and hiring hundreds of temporary workers solely to process mail voting applications and ballots.

**USPS Acknowledges a "Significant Risk" that Texans' Ballots Will Not Be Counted**

29.     In recent months, several internal policy changes at USPS, including a reduction in staff, the decommissioning of high-speed mail sorting machines, and significant restrictions in late and extra trips by mail carriers, have led to delayed mail deliveries across the nation.  These developments have been widely reported by local and national media and investigated by the U.S. House of Representatives and are the subject of multiple ongoing federal lawsuits.

30.     In a letter dated July 30, 2020, the USPS warned Texas Secretary of State Ruth Hughs that there is a significant risk some mail ballots will be delivered too late to count for the November election.  Under Texas law, mail ballot requests must be received by October 23, 2020, eleven days before election day, after which election officials must mail a ballot within seven days.  The deadline for election officials to receive a ballot is 7 p.m. on November 3, 2020,

though under certain circumstances, a ballot that was postmarked on or before election day and received by 5 p.m. on November 4, 2020 will be counted.

31.     The July 30, 2020 USPS letter stated that these state-law requirements and deadlines appeared to be "incompatible" with USPS's delivery standards and that there is a "significant risk" that properly requested mail ballots, including those that are promptly returned, will nonetheless not be processed by USPS and received by election officials in time to be counted.

32.     On August 20, 2020, Chris Hollins, the Harris County Clerk, sent a formal request to Defendant Governor Abbott to extend the deadline by which county officials must receive mail ballots to at least November 9, acknowledging that "a mail ballot postmarked on Election Day is unlikely to be received in our office the following day" and that lack of action could result in "thousands" of disenfranchised Harris County voters.

33.     Voters reported several problems while attempting to vote by mail in Texas' July 14, 2020 primary runoff election.  This included voters who sought to vote by mail, and timely submitted their applications, but never received their ballots and thus were disenfranchised. Some voters sent in their absentee ballots only to have them returned unopened.  One voter, who had voted previously by absentee ballot, reported receiving his ballot back unopened, only to mail it back again.  When he called his local elections office, an official said they still had not received his ballot two weeks after he mailed it back.

34.     These experiences in the primary election demonstrate the peril of relying on USPS to timely process election mail for the November election.

**Use of Absentee Ballot Delivery Locations in Texas**

35.     Under Texas law, eligible citizens wishing to vote by absentee ballot may return those ballots either by mail, common or contract carrier, or in-person to an early voting clerk's office.

36.     Under his July 27, 2020 Executive Order, Governor Abbott found that Texas' laws limiting the number of days for early in-person voting and restricting the in-person return of absentee ballots to an early voting clerk's office "would prevent, hinder, or delay necessary action in coping with the COVID-19 disaster."  Governor Abbott therefore suspended enforcement of those provisions, directing that early voting may begin on October 13, 2020 and that voters may return mail-in ballots as soon as the early voting period begins and through the day of the election.

37.     Relying on the Proclamation, Texas counties, particularly those with large populations like Harris and Travis Counties, began to make public plans to provide voters with multiple absentee ballot drop-off locations.  Harris County planned to provide voters with twelve supplemental absentee ballot drop-off locations.  Travis County planned to provide voters with four supplemental absentee ballot drop-off locations.  Voters have relied on these public plans in planning how they intend to vote in the upcoming election and many of these secure drop-off locations are already in use.

**The October 1 Order**

38.     On July 27, 2020, Defendant Governor Abbott issued a proclamation modifying early voting procedures for the November 2020 election.  The proclamation extended the in-person early voting period by nearly a week, allowing voters to begin casting ballots on Tuesday, October 13, 2020.  Additionally, the proclamation suspended a provision of the Texas Election

Code permitting hand delivery of mailed ballots only on election day and instead directed that voters may deliver completed ballots in person at the offices of county early voting clerks beginning on October 13.

39.     In preparation for the expected surge in mail ballots, Harris County established eleven county clerk office locations, as well as Houston sports center NRG Stadium, as sites for voters to return completed ballots sent to them by mail.  Travis County established four drive-through county office locations.

40.     Multiple Texas state officials took actions supporting and confirming the validity of the election administration plans authorized by the July Proclamation.  Most prominently, on September 30, 2020, the Texas Attorney General's office represented to the Texas Supreme Court that the July Proclamation permitted multiple ballot drop-off locations in each county.  As such, "the Secretary of State has advised local officials that the Legislature has permitted ballots to be returned to any early-voting clerk office." *In re Hotze, et al.,* No. 20-0751, Brief in Supp. Of Mandamus Petition at 5 (Tex. Sept. 30, 2020).

41.     The following day, October 1, 2020, Defendant Governor Abbott issued the October 1 Order, a proclamation billed as "enhancing ballot security" ordering that mailed ballots may only be delivered in person to a single early voting clerk's office location in each county.  The October 1 Order also mandates that early voting clerks must allow poll watchers to observe any activity conducted at the early voting clerk's office related to the in-person delivery of a marked mail ballot.

42.     While the October 1 Order was purportedly issued to address "security" concerns, there is no indication from Defendants about how this measure increases security for voters returning their absentee ballots or how the additional ballot drop off locations proposed by Harris

or Travis County officials would negatively impact security.  Absentee ballot drop-off locations are required to be staffed by an election official who is under legal obligation to verify a voter's photo identification and the information provided on the ballot before the ballot may be submitted.  Defendants have not provided an explanation for why the security measures at one drop-off location are sufficient to ensure ballot security but the same security measures are not sufficient if employed at multiple locations within a county.

43.     County election officials were given no advance notice of the October 1 Order. According to media reports, Travis County Clerk DeBeauvoir stated that she learned of the Order just as Travis County had already begun allowing eligible voters to drop off their completed mail ballots at other locations in the county that week.

**The October 1 Order's Impact on Minority Citizens**

44.     African American citizens of voting age who are eligible for an absentee ballot in Texas are more than twice as likely as Whites to not have access to a vehicle and therefore are at least twice as likely to have a travel burden in returning their mail ballots.

45.     More than 90 percent of absentee-eligible citizens of voting age who do not have access to a vehicle in their household would be expected to experience a travel burden in accessing a county drop-off location if only one location is provided per county.

46.     Texas' largest, most populous counties will be disproportionately impacted by Governor Abbott's order. As of 2018 Harris County has nearly 2.4 million registered voters and planned on having 12 total ballot drop-off locations.  Under the Order, Harris County will have just one drop-off location, at NRG Stadium in central Houston, effectively eliminating 11 planned locations.  On October 6, 2020 news reports confirmed that there were long lines at NRG Stadium, where voters were waiting to return their absentee ballots.

47.     Travis County, Texas' fifth most-populous county, has over 800,000 registered voters, but as a result of the October 1 Order may now have to close all but one of its four planned ballot drop-off locations.

48.     The estimated round-trip drive time statewide to and from a county ballot drop box location for absentee-eligible citizens of voting age was about 37 minutes for the state as a whole, but between 41 and 55 minutes for ten of the largest counties in the state.  In these counties, which includes Harris County, a substantial number of absentee-eligible voting age citizens would have to drive more than 70 minutes round trip.

49.     Because of the large minority communities in these counties and disparate vehicle ownership rates, the reductions in ballot drop-off locations resulting from the October 1 Order will have an outsized negative impact on Texas' minority citizens.

50.     Due to disparate vehicle ownership rates and the increased risks of voting in person due to COVID, the October 1 Order will therefore also place undue burdens in the ability of the elderly to participate in the November election.

51.     In Harris County, more than a third of all absentee-eligible citizens of voting age would expect to have a travel burden to access a ballot drop box if only one location is allowed and the additional absentee ballot drop-off locations are shuttered pursuant to the October 1 Order.

52.     According to the 2018 American Community Survey ("ACS") five-year estimates, prepared by the U.S. Census Bureau, Harris County, Texas has a total population of 4.602.523 persons, including 1,384,032 non-Hispanic white persons (32%), 1,958,963 Hispanic persons (43%), 855,008 non-Hispanic Black persons (19%), and 317,911 non-Hispanic Asian

persons (7%).  According to the Texas Secretary of State, Harris County had 2,357,199 registered voters in 2018, 766,674 (33%) of whom voted early.

53.    According to the 2018 American Community Survey ("ACS") five-year estimates, prepared by the U.S. Census Bureau, Travis County, Texas has a total population of 1,203,166 persons, including 590,373 non-Hispanic white persons (49%), 407,676 Hispanic persons (34%), 94,922 non-Hispanic Black persons (8%), and 78,250 non-Hispanic Asian persons (7%).  According to the Texas Secretary of State, Travis County had 774,302 registered voters in 2018, 349,045 of whom (45%) voted early.

54.    The October 1 Order means some voters in Harris County, which has a geographical area of 1,777 square miles, may have to drive up to almost 50 miles to cast a ballot, if they have access to a car at all, which many minority voters may not.  Travis County, which is 1,034 square miles, will also have a commensurate negative impact on its minority voters given that there is now only a single drop-off location.

55.    The current public health crisis, which has forced many more voters who may be susceptible to contracting and spreading COVID-19 to vote by absentee ballot, has been compounded by systemic changes and extensive delays by the USPS in processing mail.  The October 1 Order has further compounded these negative effects on voters by limiting an alternative, safe method for submitting mail ballots to one secure drop-off location per county, regardless of the size or total population of the counties, including counties with large communities of color.

**CLAIMS FOR RELIEF**
**Count I: The October 1 Order Burdens the Fundamental Right to Vote in Violation of the**
**First and Fourteenth Amendments**

56.     Plaintiffs reallege and incorporate by reference the allegations in the preceding

paragraphs.

57.     The right to vote is a "precious" and "fundamental" political right that is

"preservative of all rights." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Yick*

*Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

58.     The First and Fourteenth Amendments to the United States Constitution protect

the fundamental right to vote.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v.*

*Takushi*, 504 U.S. 428, 433 (1992).  A state government may not burden the right to vote without

adequate justification. Under the Anderson-Burdick test, Courts considering a challenge to a

state election law or process must carefully balance the magnitude of injury to the First and

Fourteenth Amendments rights that Plaintiffs seek to protect against the government's

justifications for the burdens established.

59.     The October 1 Order imposes a substantial burden on voters' rights by forcing

them to choose between risking their health by voting in-person so that they have more assurance

that their ballots will count or, instead, facing the real possibility that their ballots will not count

because of USPS delays in timely delivering absentee ballots and applications combined with the

practical inability to use the single secure drop box in their county to deliver their absentee ballot

applications and ballots. The order burdens the Texas NAACP's members and the non-member

populations that the Texas NAACP also work and seek to protect who have to drive long

distances to get to their county clerk's office.  It further burdens the Texas NAACP's members

and others who do not have access to cars and either have no access to mass transportation, or do not wish to use mass transportation if they can avoid it during the pandemic.

60. There is no legitimate justification for the October 1 Order, which disrupts the status quo by eliminating a valid method of casting ballots during an ongoing election, after Harris and Travis Counties had already operated absentee ballot drop-off locations and accepted absentee ballots at those sites. These changes, coming so late in the election process – indeed after voting has begun – will burden election administrators, confuse voters, and potentially disenfranchise them. Such a late-breaking change is particularly disruptive when, as here, it does not increase access to the ballot or fix an error, but instead eliminates an effective method of voting that increases access to the ballot – in the midst of a deadly pandemic.

61. Defendants have no legitimate interest in preventing counties from installing more than one secure drop-off location. The October 1 Order therefore fails the Anderson-Burdick test and must be enjoined.

### Count II: The October 1 Order Violates the Equal Protection Clause of the Fourteenth Amendment

62. Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

63. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment's Equal Protection Clause forbids the State from, "[h]aving once granted the right to vote on equal terms . . . by later arbitrary and disparate treatment, valu[ing] one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000).

64.     The October 1 Order arbitrarily values one person's vote as compared to another's based on population size and population density of a particular county.  Sparsely populated counties will be advantaged while counties with larger populations such as Harris County and Travis County will be disadvantaged.  Thus, while the October 1 Order substantially burdens all Texans, that burden is greater for voters who live in more populated counties because only one secure drop box is available per hundreds of thousands of registered voters in the county.

65.     Because of the October 1 Order, Defendants are responsible for administering an election system that arbitrarily burdens voters' fundamental right to vote, in particular, Plaintiff's members who live in more populous counties.

66.     This disparate treatment of voters violates the Equal Protection Clause of the United States Constitution.

**Count III: Racially Discriminatory Impact Violating Section 2 of the Voting Rights Act**

67.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

68.     Texas's Black voters are particularly susceptible to contracting and dying from COVID-19. Black voters' increased susceptibility to the dangers of COVID-19 is directly tied to social and historical conditions stemming from racial discrimination.

69.     Texas's limit of one-per-county for absentee ballot drop-off locations will have a disproportionate impact on absentee-eligible Texas NAACP members and other Black voters living in densely populated counties like Harris and Travis who wish to cast an absentee ballot without subjecting themselves to the risk of contracting COVID-19 or the risk that their mailed ballot will arrive too late to be counted.  At the time the October 1 Order was issued, Harris and Travis Counties were the only jurisdictions actively implementing additional absentee ballot

drop-off locations, and Fort Bend County officials had announced their plan to open several locations.

70.     Texas's arbitrary one-per-county limit on ballot drop-off locations violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because it results in the denial of the right to vote on account of race and language minority status, insofar as, under the totality of the circumstances, Texas NAACP members and minority voters are denied an equal opportunity to participate effectively in the political process.

71.     Texas's limits on absentee drop-off locations violate Section 2 because they deny and abridge the right to vote on account of race and language minority status when considered under the totality of the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.     Issue a judgment declaring that the October 1 Order violates the Fourteenth Amendment to the United States Constitution and the Voting Rights Act, and that county election administrators are not prohibited from establishing more than one location where voters may return their marked mail-in ballots in person;

b.     Preliminarily and permanently enjoin Defendants, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from taking any action to change the status quo by inhibiting election administrators from offering drop-off locations as described;

c.     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Voting Rights Act, 52 U.S.C. § 10310(e), and the Civil Rights Attorneys Fees Awards Act, 42 U.S.C. § 1988; and

d.      Grant such other equitable and further relief as the Court deems just and proper,

and as may be necessary to afford Plaintiffs the fully relief to which they are entitled under the

United States Constitution and the Voting Rights Act.

Dated:  October 6, 2020          Respectfully submitted,

Robert Notzon
The Law Office of Robert S. Notzon
1502 West Ave.
Austin, Texas 78701
robert@notzonlaw.com
Phone: (512) 474-7563

Nickolas Spencer*
Spencer & Associates, PLLC
8403 Westglen Drive, Suite 2000
Houston, TX 77063
nas@naslegal.com
Phone: (713) 863-1409

Ezra Rosenberg*
erosenberg@lawyerscommittee.org
John Libby*
jlibby@lawyerscommittee.org
John Powers*
jpowers@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Phone: (202) 662-8389
Fax: (202) 783-0857

John T. Montgomery*
john.montgomery@ropesgray.com
Deanna Barkett FitzGerald*
deanna.fitzgerald@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Phone: 617-951-7000
Fax: 617-951-7050
***Counsel for Plaintiffs - * Pro hac vice motion forthcoming***